UNITED STATES of America,
Appellee,

v.

Earl GUY, Appellant.

UNITED STATES of America,
Appellee,

v.

Eugene "Mike" PETERS, Appellant.

UNITED STATES of America,
Appellee,

v.

Tommy RAYMOND, Appellant.

Nos. 19987, 20002 and 20334.

United States Court of Appeals,
Eighth Circuit.

Feb. 11, 1972.

Rehearing and Rehearing En Banc Denied in No. 19987 March 17, 1972.

Ronald M. Sokol, The Legal Aid & Defender Society of Kansas City, Kansas City, Mo., for Earl Guy.

Thomas L. Duty, St. Joseph, Mo., for Eugene Peters.

Patrick G. Farnand, Minneapolis, Minn., for Tommy Raymond.

Bert C. Hurn, U. S. Atty., Anthony P. Nugent, Jr., Asst. U. S. Atty., for appellee.

Before MATTHES, Chief Judge, VAN OOSTERHOUT, Circuit Judge, and EISELE, District Judge.*

* United States District Judge, Eastern District of Arkansas, sitting by designation.

EISELE, District Judge.

Appellants Eugene "Mike" Peters, Earl Guy, and Tommy Raymond were three of the five defendants named in a six-count indictment returned in the Western District of Missouri. The other two defendants were Leonard Joe Baker and Layton C. Orr. Baker, Peters, and Raymond were charged in Counts One through Four of the indictment with passing counterfeit twenty-dollar Federal Reserve notes at specific times and to specific persons within the Western District of Missouri. Count Five charged the same three defendants with the willful possession of counterfeit Federal Reserve notes. Count Six charged all five defendants with conspiracy to pass the counterfeit notes. Thirteen overt acts in furtherance of the conspiracy were alleged, including the four acts of passing notes charged substantively in Counts One through Four.

Shortly before trial, the United States moved to sever the trial of the defendant Baker from that of the other four defendants. The request was granted. Mr. Baker testified at the trial of the other four, and was in fact the principal witness for the government. At the close of the evidence the charge against the defendant Orr was dismissed upon the government's motion. The jury then returned verdicts of not guilty as to both remaining defendants, Peters and Raymond, on Counts One through Four (the "passing" counts), guilty as to both on Count Five (the possession count), and guilty as to all three of the remaining defendants—Peters, Raymond and Guy—on the conspiracy count.[1] The three appeal from all guilty verdicts.

Although the testimony in the case is somewhat rambling, and there are indeed inconsistencies in the testimony of several of the government's witnesses and within the testimony of Baker, the essential facts, nevertheless, as testified to by the government's witnesses, with respect to the charges contained in the indictment are quite clear: Baker was shown to the basement of a cafe in Minneapolis operated by the defendant Raymond. All four of the other defendants were there at the time. A table in the basement was "littered" with money that Baker took to be counterfeit. He was told that the others planned to drive into Missouri that night and begin passing the counterfeit notes the next day. All of the defendants participated generally in the conversation concerning the plans to pass the notes, watched as the money was sprayed (apparently with some sort of substance designed to give the notes the appearance of having been well-used), and helped to stack the notes in bundles separated by cardboard dividers.

A few hours later, Baker, Raymond, and Peters left the cafe and drove into Missouri in a 1965 Cadillac. Guy apparently furnished the keys to the car. Before their departure Guy also produced a map, designating the eastern part of Missouri, and laid out the plans for the route the three were to follow. No specific town was designated. After departing, the three, apparently on their own, possibly at Baker's suggestion, decided to go to St. Joseph, Missouri, which is located in the western part of the state.

Baker and Peters attempted to pass individual notes at four retail stores in St. Joseph. At the fourth, an S. S. Kresge store, the counterfeit note Baker attempted to pass aroused the suspicions of a clerk and of a supervisor. Baker left the Kresge store, was followed by the supervisor, and returned to the car. The supervisor noted the type of automobile Baker entered and its license number. The rest of the counterfeit money was then quickly hidden in an alley, and the three returned to Minneapolis and reported to the others what had occurred in St. Joseph. After some discussion among the five defendants, it was decided that the same three should return to St. Joseph to try to retrieve the abandoned money. They did so, but the notes were gone by the time they returned. The

---

1. After the three appellants were sentenced, the indictment was dismissed as to Baker.

bundle of counterfeit notes had been found by two young men and turned over to the St. Joseph, Missouri, police.

For reversal the appellants raise many points which they assert constitute prejudicial error. Many of the asserted errors were not called to the trial court's attention. The Court will treat the points, generally, in the order in which they arose below.

■ Appellants Guy and Raymond argue that the removal proceedings pursuant to which they were brought from Minnesota into Missouri failed to comply with the extradition requirements of Article IV, § 2 of the United States Constitution. This contention ignores the fact that these defendants were charged with a federal crime rather than a state crime, the only type to which the extradition requirements of the Constitution apply. United States ex rel. Kassin v. Mulligan, 295 U.S. 396, 399–400, 55 S.Ct. 781, 79 L.Ed. 1501 (1935). Raymond and Guy were properly removed pursuant to the Federal Rules of Criminal Procedure.

·Appellants Peters and Raymond urge that a severance of their cases from those of the other defendants should have been granted. The severance question often arises in conspiracy cases, and the question sometimes presents appellate courts with difficult decisions. But the facts of this case are not those of the usual conspiracy trial. In the ordinary situation, one or more of several defendants to a conspiracy charge complain of prejudice to their separate cases when the prosecution is permitted to introduce the prior, out-of-court statement of another defendant. Such statements often tend to incriminate not only the particular defendant who made the statement, but also other defendants, against whom the statement would not be admissible. Prejudice to those other defendants may result even where appropriate cautionary instructions are given. Here, however, the only out-of-court statement in evidence was that of Baker, who was actually on the witness stand and whose case had in fact been severed. Baker's prior statement was introduced by Peters' counsel on cross-examination of Baker, in an attempt to discredit his testimony to the effect that Peters had left in the car with Baker on the trip to Missouri. The harm to Peters' case resulted from Baker's direct testimony, not from any out-of-court statement.

Raymond's brief does acknowledge that it was Baker's in-court testimony that was harmful to him. He takes that fact, however, and reaches the conclusion that his trial should have been severed from that of the other defendants, in addition to the severance from Baker's. The point is raised for the first time on appeal, and, at any rate, it is difficult to see how Baker's testimony would harm Raymond any less if he were being tried separately or how prejudice might result in either situation.

■■ To the extent that Peters and Raymond are arguing that prejudice results from the simple fact of multiple defendants or joinder of offenses, their allegations are conclusory and completely unsubstantiated by the evidence. We find nothing in the record to indicate prejudice to any one of the three appellants as a result of their being tried jointly with the others or because all of these related offenses were tried together. Certainly the trial court did not abuse its discretion in refusing to sever the defendants or the charges. More must be shown under Rule 14 of the Federal Rules of Criminal Procedure than that severance might afford an increased chance of acquittal. Williams v. United States, 416 F.2d 1064, 1069–1070 (8th Cir. 1969); Miller v. United States, 410 F.2d 1290, 1293–1295 (8th Cir. 1969); and United States v. Long, 449 F.2d at 288 (8th Cir., 1971).

■ Another asserted ground for reversal is the allegedly erroneous refusal of the trial judge to recuse himself from the trial of the case after the filing of an affidavit of prejudice by the appellant Guy. We find no error in the trial judge's decision. The affidavit of prejudice presents only the most conclusory sort of assertions and provides no factual basis for the relief requested. It was

quite properly denied by the trial judge immediately after it was filed a few weeks before the trial of the case. Appellant now seems to treat his brief as another opportunity for filing an affidavit of prejudice, listing several specific comments made by the judge during the course of the trial and in his summary of the evidence to the jury. Even treating this list of incidents as proffered evidence in support of the original affidavit of prejudice or in support of a contention that the trial judge should have disqualified himself at some later stage of the proceedings, the appellant Guy has utterly failed to demonstrate any prejudice on the part of the trial judge against him or any other defendant.

The appellant Raymond asserts error in the trial court's refusal to have the government produce, for questioning at the trial, a Secret Service agent named Shanahan. Mr. Shanahan was the agent who originally interviewed one of the witnesses called by the prosecution. The witness, Suzanne Bellin, testified that she was a clerk at a Bloomington, Minnesota, printing-supply store and that she had sold the defendant Guy some ink of the type used on offset printing presses several days before the trip to Missouri by certain of the defendants. She testified that she had talked to Mr. Shanahan about a month later and that the agent had made some notes which he read back to her for verification at the conclusion of the interview. At the trial, counsel moved for the production of the notes. When it became apparent that neither the United States Attorney's office nor the agent then in court had the notes, counsel moved for an order that the government produce Shanahan himself, who was at that time on presidential guard duty in San Clemente, California.

■ The appellant does not set forth how he was prejudiced by the denial of the motion and we can find no basis to support any contention of such prejudice. The testimony of Suzanne Bellin was utilized principally to corroborate the testimony of the witness Cagle, who made the counterfeit money, to the effect that he told the defendant Guy where to purchase the ink. Her testimony did not affect the defendant Raymond directly. When this issue was raised, the government gave the defendants a report from one FBI agent which purported to incorporate the report of agent Shanahan. The government denied that any further report made by agent Shanahan from Miss Bellin's statements to him was in existence at the time of the trial. Under the facts and circumstances existing at the time the motion was made, it was a matter within the sound discretion of the court and we find no abuse of discretion in the ruling.

■ Raymond next maintains that his conviction cannot be sustained because he deems the testimony of Baker, an acknowledged accomplice, to be essentially uncorroborated. The point is without merit. It is well settled that a conviction can rest on the uncorroborated testimony of a codefendant or accomplice. Wood v. United States, 361 F.2d 802 (8th Cir. 1966); Williams v. United States, 328 F. 2d 256 (8th Cir. 1964).

■ Raymond also urges that the testimony of Baker and of another government witness should not have been allowed to "go uncorrected" because of a discrepancy as to whether the car involved was a convertible or a hardtop. There was certainly some inconsistency in the proof on this point, as there was with respect to the color of the car, but Raymond's assertions on appeal do not appear to set forth any valid basis for reversal. It was the province of the jury to examine such discrepancies and to determine whether they were substantial enough to affect the government's case to any degree. Presumably the jury did make such an evaluation and found the inconsistencies inconsequential.

All the appellants take exception in one way or another to the sufficiency of the evidence to sustain the convictions. Many of the points presenting this issue are couched only in the most general language, and much of the supporting argument is itself nothing more than a conclusory restatement of those assertions.

We have carefully examined the entire transcript and record, together with the briefs and motions filed on appeal, and conclude that there is ample evidence from which the jury could reasonably have found that Raymond and Peters were guilty of the possession count of the indictment and that all three appellants were guilty of the conspiracy. The testimony of Leonard Joe Baker standing alone would probably have been sufficient to sustain a conviction. His statements were overwhelmingly incriminatory of all appellants. When other evidence such as the fingerprints and the eye-witness testimony of various clerks and shopkeepers is added to Baker's statements, it is apparent that the jury's verdict is amply supported by competent and credible evidence.

■ There are three particular matters which appear to spell out in just what manner the appellants feel the evidence was insufficient to support a conviction: First, Raymond argues that he cannot be found guilty of the conspiracy charge because the jury could not have found him to have performed any of the overt acts charged in the indictment. It has long been the law that an act by any one member of a conspiracy is sufficient to support a guilty verdict against all members of the conspiracy who actually had the subjective intent to enter into the agreement to violate the law. See, e. g., Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Nassif v. United States, 370 F.2d 147 (8th Cir. 1966). Here, there were several overt acts charged upon which there was sufficient evidence for the jury to have found that one or another of Raymond's co-conspirators did the necessary deed which would transform their agreement from the protected realm of mere thought into the criminal area of a completed conspiracy. And, in addition, there were overt acts alleged on the part of Raymond himself which the jury could have found were in fact committed: For example, Overt Act 1, charging that Raymond and other defendants met at his cafe and there examined the quality of the counterfeit Federal Reserve notes; or Overt Act 6, alleging that Raymond drove Peters and Baker into Missouri for the purpose of passing the notes.

Peters also contends that there were no overt acts proved which were sufficient to support a conviction on the conspiracy charge, but his reasoning is somewhat different. He reasons that Baker was not a true co-conspirator, since he had been an informant for the FBI and for other police organizations and he allegedly entered into the conspiracy solely for the purpose of obtaining evidence for the instant prosecution. From that premise, Peters reasons that Baker was not a co-conspirator and that his acts cannot fulfill the requirement that one of the conspirators perform an overt act intended to further the goal of the illegal conspiracy. However, we need not determine whether Baker was a true co-conspirator, although the jury could certainly have so found.[2] There was ample evidence that tended to prove overt acts performed by defendants other than Baker. Two such acts have been mentioned above. Others could be listed.

The last of the "sufficiency of the evidence" arguments is directed toward Peters' conviction on Count 5, the possession count of the indictment. He maintains that the evidence does not show that he possessed the counterfeit bills "knowingly", an essential element of the crime. He acknowledges possession, as well he should in light of the evidence adduced (fingerprint and otherwise), but urges that nothing shows that he knew

---

2. Baker's testimony clearly indicates that he had been an informant or agent of some type for certain law enforcement agencies at various times in the past. His testimony about his motives in joining the other defendants in the present counterfeit-bill scheme is considerably less clear, however. He testified that he was not an employee of any criminal investigation agency at the time of the alleged crime and that his first contact to report the counterfeiting operation was on January 21 or 22, 1969. He also stated that he got into the counterfeiting scheme on his own.

the bills were counterfeit. It is a well-worn truism that a defendant's knowledge of one or another of the pertinent elements of a crime, like the presence of criminal intent, can seldom if ever be established by direct, objective evidence, and certainly there was no direct evidence of what Peters knew on this point. However, there was testimony that Peters was present at the examination, spraying, and stacking of the money in the cafe basement. Further, the jury could have found that he was present during several discussions about the passing of the bills —the object of the trip—if, indeed, it did not feel that Peters actually participated in the discussions himself. Almost any of the testimony, standing alone, would have supported a finding of knowledgeable possession. The cumulative effect of all such items of evidence reduces this contention to the frivolous.

Appellant Guy argues that the question whether Federal Reserve notes are obligations of the United States was a factual issue that should have been submitted to the jury. Two arguments are urged as a basis for the contention that Federal Reserve notes are not obligations of the United States. The first, an assertion that the Federal Reserve system is unconstitutional in its entirety, has been passed upon adversely to the appellant several times by this Court. United States v. Anderson, 433 F.2d 856 (1970), and cases there cited. To that argument has now been added the contention that the notes are not obligations of the United States since they were not issued for valid consideration by the usual rules of contract. Failure of consideration, so the argument runs, voids the obligation itself. The trial court properly ruled that the point was one of law, not fact, and that Guy's position could not be sustained as a matter of law. This not being a factual issue for the jury's determination, it was not error to fail to give jury instructions thereon. And the court properly excluded evidence on this issue when it was brought up, time and again, at the trial.

Two questions are raised with respect to the venue of the prosecution. Substantively, it is argued by appellant Peters that venue was improperly laid in the Western District of Missouri. Procedurally, appellant Guy contends that the court should have given an instruction which would have required the jury to find affirmatively that venue was proper. On the substantive point, it is sufficient to say that venue is proper in a conspiracy charge in any district in which any of the overt acts occurred, Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); United States v. Phillips, 433 F.2d 1364 (8th Cir. 1970). As already set out, several of the overt acts in this case did occur in the Western District of Missouri, so venue was entirely appropriate there. As to the alleged insufficiency of the instructions on venue, it is noted that no objection was made, nor was any instruction tendered to the trial court on this point. In the absence of such a request, we will not hold that the failure to instruct as to venue is plain error that requires reversal. Bellard v. United States, 356 F.2d 437 (5th Cir. 1966).

Guy's brief contends that the asserted deficiency of the instructions with respect to venue was compounded by the failure to instruct on the possibility of multiple conspiracies. Appellant submitted no instruction he would have had the trial court give the jury, but some mention was made during the course of the trial of the possibility of multiple conspiracies. His contention is that the jury might have found there was one conspiracy to pass notes "in the Eastern part of Missouri" and a second, to pass notes in St. Joseph, to which only Raymond, Peters and Baker could have been parties, formed by those three after they left the cafe. The trial court correctly charged that the jury should consider only one conspiracy. The essence of the conspiracy charged was an agreement to pass counterfeit notes. The fact that it was decided to drive toward St. Joseph rather than into the eastern part of Missouri in

no way affected the essence, or the on-going nature, of the conspiracy.

■ The trial court's instruction to the jury on reasonable doubt has also been attacked on appeal. Two matters seem to be raised: (1) whether it was proper to define the lack of "reasonable doubt" as an "abiding conviction . . . such as you would be willing to act upon in the more weighty and important matters relating to your own affairs" and also in equating reasonable doubt with "substantial doubt"; and (2) whether it is proper for a trial court to attempt to give any definition of reasonable doubt at all. No exception was taken to the court's charge on the basis of either of these contentions, and neither constitutes plain error that would warrant reversal in the absence of such exception. United States v. Dunmore, 446 F.2d 1214 (8th Cir. 1971).

The court's instruction on intent is attacked by appellant Raymond. Again, no objection to this portion of the charge was made at the trial. The charge now complained of is: " . . . the law presumes that one intends the natural and probable consequences of his unlawful acts."

Appellant Raymond suggests that the instruction should have been phrased, "the jury *may* infer that one intends . . .". A permissive inference is legitimate, he says, but the law never requires the inference or makes conclusive the presumption. There are decisions which could be read to support the contention that use of the charge given in certain cases may constitute a ground for reversal as "plain error", and, indeed, might constitute such error even if the presumption is permissive rather than conclusive. Chappell v. United States, 270 F.2d 274 (9th Cir. 1959); Bloch v. United States, 221 F.2d 786 (9th Cir. 1955); Morissette v. United States, 342 U.S. 246, 275, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Appellant's position is further buttressed by Judge Devitt and Professor Blackmar, who, in their work on Federal Jury Practice and Instructions, 2nd ed. vol. I, § 13.06, state that it is "clearly erroneous" to give an instruction such as the one here attacked. 1 Devitt and Blackmar, op. cit. 57 (1971 Pocket Part).

■ It should be noted that in *Bloch, Chappell* and *Morissette* the question of the defendant's intent was virtually the only disputed issue. (*Bloch* was a tax-evasion prosecution, *Chappell* one for conversion of government-owned property, and *Morissette* one for theft of government property.) In each, the defendant, in effect, acknowledged he had done the underlying act but predicated his defense on the theory that he had not accompanied the act with the criminal intent proscribed by the statute. The instruction in *Bloch* was further complicated by the fact that the trial court tied the inference to specific facts—the acknowledged understatement of taxable income—rather than stating the proposition in general terms as here. See mention of this distinction in Sherwin v. United States, 320 F.2d 137, 149 (9th Cir. 1963). Neither problem is presented here. The matter of intent was not the dominant basis of defense, for Raymond or either of the other appellants. Intent, of course, is almost always an essential element of major crime, but there are instances in which it cannot fairly be said that the presence of intent is genuinely a central issue in the case or its absence the main thrust of the defense. In determining whether an erroneous instruction, such as the one here, constitutes "plain error", the Court must look at the entire record in order to decide if such error affected the substantial rights of the complaining party under all of the facts and circumstances of the particular case. Certainly it would have been preferable if the instruction had been omitted or phrased correctly, and doubtless the trial court would have omitted or modified it if the point had been raised.

■ We conclude that the use of the instruction was not "plain error" within the meaning of Rule 52(b). Imholte v. United States, 226 F.2d 585 (8th Cir. 1955). Cf. Sherwin v. United States, supra; Legatos v. United States, 222 F.2d 678 (9th Cir. 1955); Mitchell v. United

States, 140 U.S.App.D.C. 209, 434 F.2d 483, 488 (1970).[3]

Appellant Guy objects to a portion of the trial court's charge which, he contends, gave the jury the prerogative of convicting the several defendants if it found them to have been guilty of the offense of aiding and abetting the conspiracy, a crime with which they were not charged.[4] The point is made that "aiding and abetting" does not involve the element of agreement necessary to a conspiracy conviction, and that therefore the jury in the present case could have rendered a guilty verdict on the conspiracy charge even though it did not find any agreement among the conspirators, because of the court's allegedly having instructed as to what was in a sense a lesser, or at least different, offense. This contention is not well-taken. The charge does indeed employ the phrase "aided and abetted", but it is used only in a summarizing statement at the conclusion of a lengthy, correct charge as to the elements of a conspiracy. The trial court set out all the necessary elements of conspiracy, including repeated references to the necessity of an agreement among conspirators, and then mentioned the phrase "aid and abet" in its summary. The elements of the crime of "aiding and abetting" are nowhere set forth, nor is the jury told that "aiding and abetting" standing alone would justify conviction. Considering the charge as a whole, there is no reversible error in the instruction given. Cf. United States v. Bennett, 428 F.2d 772 (8th Cir. 1970); Mitchell v. United States, *supra*.

Guy also asserts that the charge to the jury did not make it sufficiently clear that the jury members were to consider the guilt or innocence of each of the defendants separately. His brief on this point again quotes from a summarizing portion of the court's charge.[5] Taken by itself, the quoted portion could have been somewhat misleading. However, the part complained of came after a detailed ex-

---

3. The *Mitchell* case, relied upon by Devitt and Blackmar, actually held that a similar instruction to the one here under attack was not plain error when not coupled with other serious error and where the remaining instructions on such issue were proper. That instruction, which was identical to the one in Green v. United States, 132 U.S.App.D.C. 98, 405 F.2d 1368 (1968), included the following: " . . . you should again bear in mind that every man is presumed to intend the natural and probable consequences of his own acts".

 *Mitchell* and *Green* are part of a series of decisions of the District of Columbia Circuit in prosecutions for murder. The cases in that series deal with instructions both on intent and on the somewhat related concept of malice.

4. The objection is to these statements:

 "Therefore, if you find and believe from the evidence beyond a reasonable doubt that the defendants or any of them knowingly aided and abetted any of the conspiracy charge, if you find that there was a conspiracy, knowing in a general way their purpose and—to commit an offense as charged in the indictment, the jury may find that the defendant at such time entered into such conspiracy or implied agreement with them and became a member of such a conspiracy."

5. The portion of the charge here attacked is:

 "And in Count No. 6, the conspiracy charge, if you find and believe from the evidence that any of these parties or all of these parties were guilty of the conspiracy, the agreement—an agreement to distribute this money, then they would all be guilty. If you find that two of them were guilty, then you should so find. In other words, if—it's perfectly —it's plain evidence—simple fact that one person cannot conspire with himself. It takes two people to make a conspiracy, to enter into an agreement. So that if these people entered into this conspiracy here and any one of them did anything to carry it into effect, then they're all together. If you find beyond a reasonable doubt that they did that, then it would be your duty to find them all guilty. If you find that they did not enter into a conspiracy regardless of any other fact or circumstance, you should find them not guilty. If you find that there was an agreement to distribute this money but that no person thereafter connected with the conspiracy did anything to carry it into effect, then it would be your duty to find them not guilty, so it is entirely up to you."

planation which correctly set out the nature of the offenses charged and the duty of the jury to consider each charge and each defendant separately. Considering the instructions as a whole, it does not seem likely that any juror could have misunderstood.

 Finally, Guy also contends that the trial court in effect "directed a verdict" against all defendants on the factual issue of whether the notes introduced as exhibits and about which several witnesses testified were in fact counterfeit. His brief lists several excerpts from the court's charge, all containing phrases such as "these counterfeit notes" and "the counterfeit money". While it is not clear that there actually was any real dispute as to the bills' lack of authenticity, the court did in fact charge (in the part of the instructions referring to the necessary elements of the substantive charges) that the jury must find that the notes were counterfeit. With regard to the conspiracy count, the only crime with which Guy was charged, it was of course not necessary to prove that any particular bill was, or was not, counterfeit, or that any counterfeit notes were passed or even existed. The conspiracy alleged was one to pass counterfeit notes, and the offense was complete once the agreement was entered into and some act taken in furtherance of it even if the conspirators fell short of ever acquiring such notes to pass. At any rate, the court's references to "the counterfeit notes" cannot be construed as a directed verdict on any factual issue in the light of the other parts of the charge.

Guy himself has attempted to file a brief "correcting" the brief filed by his counsel. He sets forth several grounds for reversal. Most of them are restatements of points raised and argued by his own attorney or by one of the other appellants. Such points as Mr. Guy has raised independently on his own behalf have been considered and found without merit.

The convictions of all three appellants are affirmed.