**UNITED STATES of America, Appellee,**

v.

**Al ZEPHIER, Appellant.**

**No. 89–5511.**

United States Court of Appeals, Eighth Circuit.

Submitted May 17, 1990.

Decided Oct. 17, 1990.

Darla Pollman Rogers, Onida, S.D., for appellant.

Mikal Hanson, Pierre, S.D., for appellee.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Al Zephier appeals his conviction for six counts of embezzlement from an Indian tribal organization in violation of 18 U.S.C. § 1163 (1988). Zephier raises the following points in support of reversal: (1) insufficiency of the evidence; (2) error in the jury instruction explaining Indian tribal organization; (3) denial of continuance to locate missing witnesses; and (4) refusal to suppress self-incriminating statements. We conclude that the trial court erred in fashioning the instruction on Indian tribal organization and therefore reverse and remand for a new trial on this ground. We reject Zephier's remaining contentions for the reasons discussed below.

## I. BACKGROUND

In 1989, the Government charged Al Zephier with six counts of embezzling funds from the Pierre Indian Learning Center (Center), an alleged Indian tribal organization, in violation of 18 U.S.C. § 1163. The Center, a school for Indian children with special needs, was founded in 1972 by fifteen federally-recognized Indian tribes af-

ter the Bureau of Indian Affairs (BIA) abandoned a similar project at the same location. The Center is a nonprofit corporation organized and incorporated for charitable and educational purposes under South Dakota law.

The Center operates under the direction of its board of directors, the Indian Board of Education (Board), which is comprised entirely of representatives from the founding Indian tribes. While employing both Indians and non-Indians, the Center serves only Indian students from the founding tribes. Since 1975, the Center has received most of its funding through a contract with the BIA under the Indian Self–Determination and Education Assistance Act. *See* 25 U.S.C. §§ 450f, 450h (1988) (amended 1988). Prior to the enactment of the Indian Self–Determination and Education Assistance Act in 1975, the Center, although in existence, was not operational.

From 1977 to 1989, Zephier acted as chairman of the Board. During that time, the Center reimbursed Zephier for travel expenses for six conferences which Zephier admitted not attending. For his defense, Zephier presented evidence that a variety of accidental misfortunes caused his non-attendance. In addition, Zephier argued that, as a matter of law, the Center was not an Indian tribal organization under section 1163. The trial court nevertheless denied Zephier's motion for a judgment of acquittal, and the jury returned guilty verdicts on all six counts. Thereafter, the trial court sentenced Zephier to concurrent ten-month terms of imprisonment. This appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

The indictment charged Zephier as follows:

Al Zephier did unlawfully embezzle, steal, knowingly convert to his own use, and willfully misapply monies, funds and assets of an Indian Tribal Organization ... in violation of 18 U.S.C. § 1163.

Zephier contends that the evidence was insufficient to show that the Center is an "Indian tribal organization" within the meaning of section 1163.

By contrast, the Government, relying on our decision in *United States v. White Horse*, 807 F.2d 1426, 1429 (8th Cir.1986), asserts that the Indian tribal organization element under section 1163 always presents a jury issue. As to the Government's argument, however, *White Horse* is inapposite. In that case, we were concerned with protecting a defendant's right to put the government to its proof. *Id.* at 1429–32. Thus, our holding in *White Horse* would not prevent a judgment of acquittal where no reasonable jury could find the Indian tribal organization element satisfied. *See, e.g., United States v. Vetter*, 895 F.2d 456, 460 (8th Cir.1990). We thus proceed to address Zephier's contention that, as a matter of law, the Center does not qualify as an Indian tribal organization under section 1163.

Central to the resolution of this case is the meaning of the statutory term "Indian tribal organization" contained in 18 U.S.C. § 1163. The pertinent statutory provision reads:

As used in this section, the term "Indian tribal organization" means any tribe, band, or community of Indians which is subject to the laws of the United States relating to Indian affairs or any corporation, association, or group which is organized under any of such laws.

Section 1163, by its terms, thus provides two alternative definitions for the term "Indian tribal organization": (1) a tribe, band or community of Indians subject to the federal laws relating to Indian affairs, or (2) a corporation, association or group that is organized under such laws.

Zephier first argues that the Center is not a "tribe, band, or community of Indians" within the meaning of section 1163. We agree. Here, Zephier is not accused of stealing from a particular Indian tribe but from a multi-tribal school.[1] Thus, the Cen-

---

1. Our review of the statutes convinces us that Congress did not intend the term "community" to include multi-tribal charitable or educational corporations. *In reference to Indian affairs,*

ter fits, if anywhere, under the second alternative definition of section 1163. Accordingly, the Government was required to prove that the Center, a corporation, was organized under the federal laws relating to Indian affairs.

■ As to the second definition, Zephier admits that the Center is a corporation, but contends that it was not organized under the federal laws for Indian affairs. To support this proposition, Zephier relies heavily on (1) the Center's incorporation under state law at a time prior to the enactment of the federal provisions authorizing the Center's contract with the BIA; and (2) the fact that the Center, as a state corporation, would remain structurally unchanged regardless of its compliance with the terms of its federal contract. These factors do not resolve the issue. Federal cases recognize that certain organizations fall within the statutory definition of Indian tribal organization, notwithstanding that the organization may be chartered as a separate corporate entity under state law. *United States v. Logan*, 641 F.2d 860, 862 (10th Cir.1981). Thus, although relevant, neither status as a state corporation nor potential independence from federal funding provisions necessarily precludes the Center's characterization as an Indian tribal organization under section 1163.

■ The critical issue in determining whether a corporate entity constitutes an Indian tribal organization under section 1163 focuses on whether a sufficient nexus exists between the corporation and an Indian tribe or tribes. *White Horse*, 807 F.2d at 1430. In *White Horse*, we considered whether a corporate telephone authority, chartered by the Cheyenne River Sioux Tribe, constituted an Indian tribal organization. *Id.* at 1428–32. The telephone authority was owned and controlled by the tribe, but its day-to-day operations re-

mained distinct from the tribe. In that case, we determined that

> the issue of whether the Telephone Authority was an Indian tribal organization required an assessment of the probative value of the ordinance establishing the Telephone Authority, the testimony regarding the managerial control the Tribe exerted over the Telephone Authority, the testimony concerning their financial relationship, and various other evidence that might have tended to prove that a sufficient nexus existed between the Tribe and the Telephone Authority.

*Id.* at 1432.

In *United States v. Brame*, 657 F.2d 1090, 1091–93 (9th Cir.1981), the Ninth Circuit considered whether an Indian housing authority established by the Hopi Tribal Council pursuant to federal regulation constituted an Indian tribal organization under section 1163. In concluding that the tribal housing authority qualified as an Indian tribal organization, the court observed that (1) the tribe, through its council, participated and exercised at least indirect control over the housing authority; (2) the evidence demonstrated interdependence between the housing authority and other arms of the tribal government; and (3) the ordinance creating the housing authority undisputedly complied with and was patterned after federal regulations for the establishment and administration of Indian housing authorities. *Id.* at 1092–93.

Similarly, the Tenth Circuit, in *United States v. Crossland*, 642 F.2d 1113, 1114–15 (10th Cir.1981), held that a Cherokee housing authority, created by state statute and administered under federal regulatory provisions applicable to Indian housing authorities, qualified as an Indian tribal organization under section 1163. The court said:

> Thus although the Authority was organized pursuant to state law, its members

Congress predominantly employs the term "community" to denote federally-recognized Indian tribes, *see, e.g.,* 25 U.S.C. §§ 450b(e), 692(a), 1452(c), 1603(d), 1801(a)(2), 1903(8), 2019(13), 2101(2), 2201(1), 2403(3), 2703(5) (1988), or localities, *see, e.g.,* 25 U.S.C. § 1603(g) (1988). By contrast, Congress employs other terms to refer to organizations resulting from multi-tribal ventures. *See, e.g.,* 25 U.S.C. §§ 450b(1), 472a(f)(1)(B), 1452(e), 1603(e), (h), 1801(a)(4), 1903(7), 2011(f)(2)(B) (incorporating 25 U.S.C. § 2019(9)), 2019(7), 2511(3)(A)(ii) (1988).

were selected by the tribe, its function was to serve the needs of the tribe, and its activities were supervised by the tribe. Thus appellant's argument that the Authority's creation by virtue of state statute precludes its character as an Indian tribal organization is unfounded.

*Id.* at 1114.

Likewise, in *Logan,* 641 F.2d at 861–62, the Tenth Circuit determined that a private Oklahoma corporation organized through the mutual efforts of the BIA and the Choctaw tribe in order to participate in the Indian Financing Act of 1974 constituted "a corporation organized under the laws of the United States relating to Indian affairs within the meaning of section 1163." In reaching this result, the court noted: "We do not believe that Oklahoma law and the Indian Financing Act are mutually exclusive; a corporation may be organized under both, as was done here." *Id.* at 862.

■ In reviewing the above cases, we discern two essential ingredients to the Indian tribal organization element as applied to state law corporations. First, Indian tribes, and not some other group, must possess de facto control over the corporation. This requirement can be satisfied with proof, including, but not limited to, evidence that one or more Indian tribes (1) play a vital role in the establishment and continuity of the corporation, *Brame,* 657 F.2d at 1092; (2) exercise direct or indirect control over the corporation's operations, *id.* at 1093; (3) select the members for the corporation, *Crossland,* 642 F.2d at 1114; and (4) are the intended beneficiaries of the corporation's services, *id.* Secondly, the entity must be patterned after or deliberately have conformed its operations to federal laws for Indian affairs. *See Brame,* 657 F.2d at 1092. These requirements are likewise indicated by our review of the pertinent statutory history, which we relate below.

The legislative history indicates that Congress enacted section 1163 to serve the following purposes:

> The principal objective of the proposed bill is to protect Indian tribal organiza-

tions, especially those created pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), from the actions of dishonest or corrupt *tribal* officials. It provides for the punishment of persons holding positions of trust in *tribal* organizations who abuse their responsibilities by diverting *tribal* funds to their own pockets or those of their friends. . . .

> During the years since the first group was organized under the Indian Reorganization Act, situations have been encountered from time to time that involved the misuse or misappropriation of *tribal* funds, the lack of adequate accounting records, or other improper actions by *tribal* officials. Occasionally, the same official has been guilty of repeated breaches of trust. Yet in most instances the creation of fiduciary positions has not been paralleled by corresponding safeguards in the law and order codes under which the *tribes* operate. Even in those instances where criminal sanctions are provided in the *tribal* codes, the *tribal* members have been extremely reluctant to bring actions in the *tribal* courts against apparently faithless *tribal* officials. The only practical recourse available to *tribal* members, therefore, has been to vote the malefactors out of office in the *tribal* elections.

S.Rep. No. 2723, 84th Cong., 2d Sess. 1–2, *reprinted in* 1956 U.S.Code Cong. & Admin.News 3841, 3841–42 (emphasis added). Thus, the above passage evinces an exclusive Congressional concern about the mismanagement of funds entrusted to the control of tribal entities.

The quotation above likewise indicates that Congress intended that corporations under the statute possess a close connection with federal laws for Indian affairs. As the above passage indicates, in passing section 1163, Congress was primarily concerned with organizations created pursuant to the Indian Reorganization Act. The Indian Reorganization Act contained explicit provisions under which Indian tribes, for the first time in their history with the United States, could organize for their common welfare and form corporations to

manage tribal business affairs. Indian Reorganization Act, ch. 576, §§ 16, 17, 19, 48 Stat. 984, 987–88 (1934) (current version at 25 U.S.C. §§ 476, 477, 479 (1988).[2] After passing the Indian Reorganization Act, Congress became concerned about mismanagement of funds by tribal organizations formed under the Act. This Congressional concern is further evidenced by the following excerpt:

> The Indian Reorganization Act ... deals with a wide variety of subjects, including land, credit, education, and Indian employment....
>
> Under authority of the Indian Reorganization Act, many Indian groups are qualified to obtain control of substantial sums of money derived from oil and gas leases, timber sales, and the like, to hold these funds in the tribal treasuries, and to expend them subject to the tribal constitutions and charters. In addition, under annual appropriation acts adopted by the Congress, tribal funds in the Treasury of the United States may be advanced to Indian tribes.
>
> Under these circumstances, it is felt that adequate Federal penal safeguards are necessary to protect the tribal members and the public generally from actions of dishonest and corrupt tribal officials, and of other persons, including non-Indians, who commit these offenses involving tribal property.

H.R.Rep. No. 6403, 84th Cong., 2d Sess. 2 (1956).

In view of the legislative history stressing the statute's application to organizations formed under the Indian Reorganization Act, we believe that Congress envisioned that tribal organizations under section 1163 would possess a close relationship with federal laws for Indian affairs. This interpretation comports with the plain language of the statutory definition, which requires corporations to be "organized under" the federal laws for Indian affairs. Accordingly, we determine that the organization in question must deliberately conform to or comply with the federal laws for Indian affairs.

■ Applying the above standards, we conclude that the Government provided ample proof that the Center satisfied the Indian tribal organization element of section 1163. The Center was organized to serve the educational needs of Indian children and operated under the direction of appointed representatives from the beneficiary tribes. Furthermore, according to the Government's evidence, each of the beneficiary tribes approved the Center's contract under the Indian Self–Determination and Education Assistance Act yearly. Notably, all of the tribes conditioned their approval on the Center's compliance with the Act's provisions.

**B. Jury Instruction on Indian Tribal Organization**

■ Zephier next contends that the trial court's instruction to the jury on the Indian tribal organization element violated due process. We agree.

At trial, the defense hotly disputed the Government's allegation that the Center constituted an Indian tribal organization for the purposes of section 1163. Consequently, the topic generated considerable discussion between the court and the parties at the jury instruction conference. Over defense counsel's objection, the court indicated that it would follow an instruction given on remand of the *White Horse* case, which, as noted, dealt with a tribal telephone authority.[3] That instruction read as follows:

> Defendant in this case is accused of embezzling, stealing, misapplying and

---

**2.** These reorganization provisions originally required the organizing tribe or tribes to reside on one reservation. S.Rep. No. 577, 100th Cong., 2d Sess. 35, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3908, 3925. This requirement may or may not have been altered by subsequent amendments. *See* Act of Nov. 1, 1988, Pub.L. No. 100–581, § 101, 102 Stat. 2938, 2938 (1988); S.Rep. No. 577, 100th Cong., 2d Sess. 2, 35, *reprinted in* 1988 U.S.Code Cong. & Admin.

News 3909, 3925. The plain language of section 1163 contains no territorial limitation, however, so we do not think that a broader interpretation would contravene Congressional intent.

**3.** Counsel in *White Horse* did not appeal the instruction given on remand, and we render no opinion on its propriety here.

converting to his own use monies and funds belonging to an Indian tribal organization.

The term "Indian tribal organization" means any tribe, band or community of Indians which is subject to the laws of the United States relating to Indian affairs or any corporation, association of groups [sic] which is organized under any of such laws.

In order to be convicted of the crime charged in the indictment the defendant need not embezzle, steal, misapply or convert funds coming directly from the general fund of an Indian tribe. For the purposes of this statute, the Cheyenne River Sioux Tribe Telephone Authority can constitute an Indian Tribal Organization if there is a sufficient nexus or connection between the Telephone Authority and the Tribe. In making such a determination you may consider evidence as to the financial relationship between the Tribe and the Telephone Authority, the ordinance establishing the Telephone Authority, the managerial control the Tribe had over the Telephone Authority, and any other evidence that goes to show that sufficient nexus or connection existed between the Tribe and the Telephone Authority.

During closing arguments, defense counsel argued strenuously that the Center, due to its history and organizational structure, was neither a tribe, band or community, nor a corporation organized under the federal laws for Indian affairs. Thereafter, the trial court, sua sponte, abandoned the substance of the instruction discussed in conference and instead gave the following oral instruction:

Defendant in this case is accused of embezzling, stealing, misapplying or converting to his own use monies and funds belonging to an Indian tribal organization.

The term "Indian tribal organization" means any tribe, band or community of Indians which is subject to the laws of the United States relating to Indian affairs. The term Indian tribal organiza-

tion means any tribe, and or community of Indians which is subject to the laws of the United States relating to Indian affairs. The term Indian tribal organization means any corporation, association of groups [sic] organized under any of such laws relating to Indian affairs of the United States. In order to be convicted of a crime charged in the Indictment, the defendant need not embezzle, misapply or convert funds coming directly from the general fund of an Indian tribe or tribes. For the purposes of this statute, the Pierre Indian Learning Center referred to in the Indictment can constitute an Indian tribal organization if there is a sufficient nexus or connection between the Pierre Indian Learning Center and an Indian tribe or tribes. In making such determination in this case, you may consider all of the evidence that you heard during the trial, and among other things, you may consider any evidence, if any, concerning who does the selection of the employees of the Pierre Indian Learning Center. You may consider the evidence, if any, as to what person or entity determines who shall be employed at the school, how much they shall be paid and who is designated to be the person making the payments of the funds available to the entity; in other words, available to the Pierre Indian Learning Center. You may also consider the evidence, if any, of the source of funds for the operating of the Pierre Indian Learning Center. You may consider the history of the center, if any. You may consider evidence, if any, of the source, if any, of the technical advise [sic] afforded to the Pierre Indian Learning Center from any source outside of the immediate members present daily at the learning center. You may consider the evidence, if any, of the reason or reasons for the founding of the Pierre Indian Learning Center. You may also consider the evidence, if any, the reasons for the continued operation of the center. You may consider the evidence, if any, of how the persons making up the student body are selected and for what purposes and how it is determined what type of people and the overall purposes of the Learning Center.

I'm not saying there is evidence about this because, members of the jury, I want to stress I can't tell you what the evidence is and I don't mean to, but I can leave it up to you what the evidence is and what you find to be a fact. But in this regard, in this Indian training center definition, I am simply indicating to you various things which you may, if you wish to do so, properly consider in reaching a decision on that point. Now, you may also consider any of the evidence, if any, as to how the school is managed day to day and over a year, and who is the top authority as to the management of the school, the Pierre Indian Learning Center. You may consider any evidence, if there is any, as to how that management is selected, the top management and you may consider the evidence, if any, of the extent to which, if at all, Indian tribes participate in the management and in the selection of any part of the management, and you may consider the evidence, if any, whether there is a governing body and how members are selected and by whom.

You may also consider whether there is any evidence, if any, as to whether the entities or persons who have the right to select the management have a right to change any of the particular representatives; in other words, that would also involve consideration of how the representatives are selected.

You may also in determining whether or not the Pierre Indian Learning Center is or is not an Indian tribal organization, you may also consider if you choose to do so, whether there is a connection or in your mind a sufficient nexus or connection between the Pierre Indian Learning Center and the Indian tribe or tribes, and in making that determination, you may consider the evidence, if you find there was evidence along the line I have indicated to you.

Now, in working on these instructions, I decided to go to the dictionary for the word "nexus" and even looking in several, the best I could come up with was that it is to "connect up", "to be linked", "to be interconnected", "to be tied", "to be connected through". So the terms "nexus" and "connected" or "connections" do enter in because you may consider whether there is a sufficient nexus or connection or not. *If you found consistent with what I have said up to now, you could find that the Pierre Indian Learning Center is in the eyes of the law, an Indian tribal organization, and if you didn't find that way, you could find that it wasn't.*

(Emphasis added.)

In addition to being prolix and confusing, the above instruction was prejudicially erroneous and requires a new trial. The court's instruction listed a broad variety of evidentiary considerations that, while perhaps indicative of some general connection to Indians, directed the jury's attention to many details of questionable relevance and did not inform the jury specifically what element or elements the Government needed to prove to establish that the Center constituted an Indian tribal organization. As already noted, the Center was not a tribe, band or community of Indians. The judge therefore should have focused the jury's inquiry on whether the Center was a tribal corporation organized under the federal laws for Indian affairs.

As noted above, there were two considerations for this inquiry: (1) whether the tribes possessed de facto control over the Center, and (2) whether the Center deliberately complied with or conformed to the laws for Indian affairs. By contrast, the instruction given, for example, permitted the jury to conclude that the Center was an Indian tribal organization based merely on a finding that Indians or tribal members played key managerial roles. Hence, the instruction materially failed to focus on the relevant elements relating to whether the Center was or was not an Indian tribal organization. We therefore reverse under the principles enunciated in *United States v. Hiscott*, 586 F.2d 1271, 1275 (8th Cir. 1978).

Additionally, the instruction provided little guidance about how competing considerations should be weighed. Instead, the instruction loosely indicated that the jury

**1376**

"could find" the Center an Indian tribal organization even if certain facts indicating a nexus were lacking. At the very least, the language suggests that the jury might reach such a result. This language, in essence, permitted the jury discretion to resolve the tribal organization element in any way it saw fit. Zephier, however, was entitled to have a jury determine beyond a reasonable doubt that the Center constituted an Indian tribal organization under section 1163. *White Horse*, 807 F.2d at 1429.

We do not mean to be splitting hairs. Under the circumstances of this case, however, the definition of Indian tribal organization plays critical importance. Here, the Government chose to prosecute Zephier under a general statute calling for a five-year penalty. Our review of the pertinent statutes suggests that the Government might well have prosecuted Zephier under a specific statute calling for only a two-year penalty. *See* 25 U.S.C. § 450d (1988) (imposing criminal penalty for embezzlement of Indian Self–Determination and Education Assistance Act monies). Because of the Government's decision to proceed under a statute calling for greater penalties, we deem it especially important to insure that the Government's proof conforms to the specific definitional requirements of section 1163.

We add an additional comment. In a case of this kind, we leave the determination of instructional matters to the district court. Nevertheless, because the proper definition of Indian tribal organization has generated considerable confusion in this circuit where, as here, an entity is separate from a tribe or tribes, we suggest that an instruction in similar cases might state:

The defendant in this case is accused of embezzling, stealing, misapplying and converting to his own use monies and funds belonging to an Indian tribal organization. For the purposes of this case, the term "Indian tribal organization" includes any corporation, association or group which is organized under the laws of the United States relating to Indian affairs.

To qualify as a corporation, association or group organized under the United States laws relating to Indian affairs, the organization must satisfy two requirements. First, Indian tribes, and not some other group, must control the organization either in fact, or through their elected or appointed representatives.[4] Second, the organization must deliberately conform to or comply with federal laws governing Indian affairs.

### C. Continuance

Zephier next contends that the trial court abused its discretion in denying a motion for continuance to locate two witnesses. In view of our reversal on the instructional issue, any subsequent retrial will render this point moot. We therefore do not address it further.

### D. Suppression Motion

■ For his final argument, Zephier contends that a federal investigatory agent interviewed him in violation of his fifth and sixth amendment rights to refuse to provide self-incriminating information. In particular, Zephier claims that the agent targeted him for criminal investigation and was therefore required to provide *Miranda* warnings before asking any questions. We nevertheless agree with the trial court's conclusion that Zephier voluntarily consented to talk with the agent. *See United States v. Goodreau*, 854 F.2d 1097, 1098–99 (8th Cir.1988). The evidence demonstrates that the agent was unarmed, conducted the interview on Zephier's own turf and employed neither threats nor coercion to obtain the statements. Significantly, after the interview, Zephier told the agent to keep up the good work and went home.

**4.** The following constitute relevant considerations to establish whether or not Indian tribes possess a right to control an organization: (1) whether Indian tribes have played a vital role in the establishment and continuity of the organization; (2) whether Indian tribes in fact exercise direct or indirect control over the organization's operations; (3) whether Indian tribes select the members for the organization; and (4) whether Indian tribes or tribal members are the intended beneficiaries of the organization's services. The factors outlined here may be tailored in other cases to the facts in any given case.

## III. CONCLUSION

The trial court's instruction to the jury on Indian tribal organization constituted prejudicial error. Accordingly, we reverse and remand this case for a new trial in accordance with this opinion. The defendant's remaining contentions were properly denied or were moot.